# EXHIBIT D

STATE OF MICHIGAN

54-A JUDICIAL DISTRICT COURT (CITY OF LANSING)


THE PEOPLE OF THE STATE OF MICHIGAN,

v.                                          File No. 16-03901

CHARLES FUNK,

                    Defendant.

_____/

EXCERPT OF JURY TRIAL

(Opening Statements and Testimony Only)

Session I (of 2)

BEFORE THE HONORABLE LOUISE ALDERSON, DISTRICT JUDGE

Lansing, Michigan – Tuesday, January 10, 2017

APPEARANCES:


For the People:            RUSSEL CHURCH (P70786)
                           Assistant Prosecuting Attorney
                           303 West Kalamazoo Street, Floor 4R
                           Lansing, Michigan 48933


For the Defendant:         J. NICHOLAS BOSTIC (P40653)
                           Attorney at Law
                           909 W. Washington Avenue
                           Lansing, Michigan  48906

Recorded By:               Tami Marsh, CER 5271
                           Certified Electronic Reporter
                           (517) 483-4421

Also Present:              Nancy Xiong, Court Clerk

1

```
 1          truth, under penalty of perjury?
 2                  MR. PALMER:  I do.
 3                  THE COURT:  Thank you.  And as far as our
 4          interpreter, sir, if you can please raise your right hand.
 5          Do you swear or affirm to truthfully translate in this
 6          matter to the best of your ability for both the witness
 7          and the Court?
 8                  MR. KAISER: I do.
 9                  THE COURT:  And, sir, let's get your name for
10          the record.
11                  THE INTERPRETER:  Ryan Kaiser.
12                  THE COURT:  Thank you.
13                  (At 1:36 p.m., Ryan Kaiser sworn by the Court to
14                  interpret English for Paul Palmer)
15                          PAUL PALMER,
16          At 1:36 p.m., called by Mr. Church and sworn by the Court;
17          testified as follows:
18                          DIRECT EXAMINATION
19   BY MR. CHURCH:
20   Q    Could you tell us your name, sir?
21                  THE WITNESS: Paul Palmer.
22                  MR. CHURCH:  I guess what I'm looking for is if
23          you're having difficulty understanding Mr. Palmer, if you
24          would let us know by raising your hand and we'll have Mr.
25          Kaiser tell you what it was that Mr. Palmer said.  Does
```

```
 1        that work for everyone?
 2   BY MR. CHURCH:
 3   Q    Mr. Palmer, on August the 8th of 2016, where did you live?
 4              THE WITNESS:  3101 Trappers Cove Trail,
 5        Apartment 1-A
 6   Q    Apartment 1-8?
 7              THE WITNESS:  A.  Apple.
 8   Q    On the afternoon of August --
 9              THE COURT:  Mr. Church, we're not getting a good
10        transcript based on that.
11              MR. CHURCH:  Okay.  So do you want him to repeat
12        everything that Mr. Palmer says?
13              THE COURT:  Yes.
14              MR. CHURCH:  Okay.  No problem.
15              THE INTERPRETER:  3101 Trappers Cove.
16              THE WITNESS:  Trail.
17              THE INTERPRETER:  Trail.  Apartment 1-A,
18        Lansing, Michigan.
19              THE WITNESS:  Yeah.
20   BY MR. CHURCH:
21   Q    Do you know what -- I'm sorry, let me strike that.  On the
22        afternoon of August the 8th before 6:00 in the evening
23        where had you been?
24              THE INTERPRETER:  Ingham County Community Mental
25        Health?
```

15

```
 1                    THE WITNESS: (Unintelligible)
 2                    THE INTERPRETER:  Ingham, Eaton, and what was
 3          the first one?
 4                    THE WITNESS:  Clinton, Eaton, Ingham.
 5                    THE INTERPRETER:  At the local community mental
 6          health?
 7                    THE WITNESS:  Yeah.
 8                    THE COURT:  Okay.  As a translator, if you need
 9          some paper, we can get this for you, but you need to ask
10          further questions, but repeat exactly what was said.
11          Okay?  I thought that was how you would present it to the
12          Court.
13                    THE INTERPRETER:  I apologize.
14                    THE COURT:  All right.  If you need some paper,
15          we can get you that.
16     BY MR. CHURCH:
17     Q    And why were you at the Clinton, Eaton, Ingham Community
18          Mental Health?  Let me stop you so that Mr. Kaiser can
19          tell us what you said.
20     A    I was at a committee meeting that night.
21     Q    What time did the committee meeting finish?
22     A    Six.
23     Q    Exactly at six?
24     A    Just a little bit after six.
25     Q    And where were you going from that committee meeting?
```

```
 1  A    I was on my way home.
 2  Q    How often have you traveled the route between the
 3       Community Mental Health Center and your apartment on
 4       Trappers Cove?
 5  A    Five years.
 6            THE WITNESS:  Yeah.
 7  Q    In that five-year period would you have an opinion as to
 8       how many times you've travelled that route?
 9  A    About -- I have to say many times.
10  Q    So how familiar are you with the intersection of Jolly and
11       Pennsylvania?
12  A    I'm very familiar.
13  Q    Do you have to cross that intersection to get to your home
14       from Community Mental Health?
15            THE WITNESS:  Yeah.
16  Q    And what is the route that you took to go home from
17       Community Mental Health?
18  A    Southbound on Jolly Road.  I was crossing Pennsylvania.  I
19       was eastbound.
20  Q    On what road were you eastbound?
21  A    Eastbound on Jolly Road.
22  Q    And what direction does Jolly Road run?
23  A    East and west.
24  Q    The Community Mental Health Center that you were coming
25       from, which side of Jolly Road was it on?
```

17

1   A   Southbound.

2   Q   And your apartment, what side of Jolly Road is it on?

3   A   Northbound.

4   Q   And what point do you cross Jolly Road to get onto the

5       northbound lanes typically, or the northbound sidewalk?

6   A   I was usually eastbound.

7               THE WITNESS:  Yeah.

8   Q   Maybe a bad question.  On this way that you've travelled

9       many times, am I correct in understanding you, that you

10      have to cross Jolly Road at some point to get to your

11      home?

12              THE WITNESS:  Yeah.

13  Q   Where would you typically cross Jolly Road?

14  A   At the intersection.

15  Q   Which one?

16  A   Of Jolly and Pennsylvania.

17  Q   So on August the 8th when you arrived at Jolly and

18      Pennsylvania, where were you originally in terms of what

19      part of the intersection?

20  A   I was southbound going northbound.

21  Q   On Jolly Road?

22              THE WITNESS:  Yeah.

23  Q   What was the first intersection or the first part of the

24      intersection that you crossed?  If at any point you don't

25      understand my questions, let me know.

18

1   A   Jolly and Penn.

2   Q   So did you cross -- what road did you cross first?

3   A   Pennsylvania.

4   Q   All right.  So that was traveling from what direction?

5   A   Westbound to eastbound.

6   Q   So when you got to the east side of Pennsylvania, what

7       were you going to do then?

8   A   I was crossing Jolly northbound.

9   Q   Did anything unusual happen to you as you started to cross

10      that road?

11  A   I tried to cross that intersection.  I tried to back up,

12      but the cop car was headed toward me.  I had a slow

13      reaction.  I usually watch my left side for oncoming cars,

14      but I didn't think about it.

15  Q   Prior to when you arrived at that intersection to cross

16      northbound, how were traffic lights set up?

17  A   I had a red sign telling me do not walk.

18  Q   Is there anything on a traffic pole that you have to do in

19      order to get --

20          THE WITNESS: Yes.

21  A   I pushed the traffic signal.

22          THE WITNESS:  Yeah.

23  Q   When the light turned green, what happened to the

24      pedestrian signal?

25          THE WITNESS: (Unintelligible)

19

```
 1  BY MR. CHURCH:
 2  Q    Is there a symbol for --
 3                THE COURT:  I'm sorry, I didn't have that
 4       answer.
 5                MR. CHURCH:  Oh, I'm sorry.  I stepped on --
 6                THE INTERPRETER:  I waited for the oncoming cars
 7       to turn my way.
 8  BY MR. CHURCH:
 9  Q    Did you have a signal on the crosswalk indicator that said
10       what you were supposed to do?
11                THE WITNESS:  Yeah.
12  Q    And what was that symbol?
13  A    Walk.
14  Q    You said you waited for oncoming traffic.  How long did
15       you wait?
16  A    Thirty seconds.
17  Q    Before you went into the intersection?
18                THE WITNESS:  Yeah.
19  Q    Okay.  And what -- go ahead.
20  A    Yeah.
21  Q    What happened when you started to go into the
22       intersection?
23  A    I started to go ahead, but the cop car hit my chair.  I
24       couldn't stop to put my chair in reverse.
25                THE WITNESS: Yeah.
```

20

|    |   |                                                                       |
|----|---|-----------------------------------------------------------------------|
| 1  | Q | And if I could get you, Mr. Palmer, to kind of only give              |
| 2  |   | an answer that's eight or ten words and then let Ryan tell            |
| 3  |   | the jury and the court recorder what you said?                        |
| 4  |   | THE WITNESS:  Yeah.                                                    |
| 5  | Q | If we break it down into smaller bites, then it will be               |
| 6  |   | more accurate.                                                        |
| 7  |   | THE WITNESS:  Yes.                                                     |
| 8  | Q | So when the cop car hit your chair, where did it hit you?             |
| 9  | A | Left side of my chair.                                                |
| 10 | Q | What part -- where on the left side of your chair?                    |
| 11 | A | Right on the wheel.                                                   |
| 12 | Q | For the record, you're pointing down to the larger of the            |
| 13 |   | six largest of the six wheels on the left hand side?                  |
| 14 |   | THE WITNESS:  Yes.                                                     |
| 15 | Q | Did it leave any kind of a mark on the chair?                         |
| 16 | A | Not at the time I recognized.                                         |
| 17 | Q | Did you later realize whether it had left a mark?                     |
| 18 |   | THE WITNESS:  Yes.                                                     |
| 19 | A | Yes.                                                                  |
| 20 | Q | When did you realize it had left a mark?                              |
| 21 | A | When I got home.                                                     |
| 22 | Q | Is that mark still there?                                             |
| 23 | A | Yes.                                                                  |
| 24 |   | MR. CHURCH:  I have a photograph.  If I could                         |
| 25 |   | approach with what's been marked as People's Exhibit 3.              |

```
 1  BY MR. CHURCH:
 2  Q    Mr. Palmer, I want to show you, it's a black and white
 3       photograph, and ask if you can recognize what that is?
 4  A    That's my wheel.
 5  Q    You recognize the photograph?
 6                 THE WITNESS:  Yeah.
 7  Q    And does that photograph fairly and accurately show the
 8       mark that you saw when you got home?
 9                 THE WITNESS:  Yeah.  Yeah.
10  Q    You did not take this photograph?
11                 THE WITNESS:  No.
12  Q    But it is a representation of that mark?
13                 THE WITNESS: Yeah.
14                 MR. CHURCH:  At this point, Your Honor, I like
15       to move for the introduction of People's Exhibit 3.
16                 THE COURT:  Any objection to People's 3, Mr.
17       Bostic?
18                 MR. BOSTIC:  No, Your Honor.
19                 THE COURT:  People's 3 will be admitted.
20                 MR. CHURCH:  May I publish it, Your Honor?
21                 THE COURT:  As it is.
22                 MR. CHURCH:  As it is.
23                 THE COURT:  Okay.
24  BY MR. CHURCH:
25  Q    And if I understand you correctly, that damage has not
```

1    been repaired?

2    A    No, it has not.

3    Q    In addition to the mark that you saw later, did anything

4    else happen in terms of you having contact with the police

5    car?

6    A    I fell out of my chair and my joystick was bent down.

7    Q    And what caused you to come out of your chair?

8    A    I tried to jump -- let me back up.  I lost control of my

9    body.

10    Q    And where did you wind up when you came out of your chair?

11    A    On the pavement.

12    Q    What did the police car do?

13    A    It stopped.

14    Q    How quickly did it stop?

15    A    It knocked me out of my chair.

16    Q    And then what did it do, the police car?

17            THE COURT:  You need to speak up, Mr. Church.

18            MR. CHURCH:  I'm sorry.

19  BY MR. CHURCH:

20    Q    What did the police car do after it knocked you out of

21    your chair?

22    A    It bent my wheel.

23    Q    Okay.  But what did the police car do after it struck you?

24    A    I can't recall.

25    Q    Did anyone get out of the police car?

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Who got out of the police car? |
| 3 | A | Officer Funk. |
| 4 | Q | Did you know him before this happened? |
| 5 | A | No. |
| 6 | Q | So how was the person who got out of the police car |
| 7 | | dressed? |
| 8 | A | In a uniform. |
| 9 | Q | Okay.  And if you saw the person again would you recognize |
| 10 | | him? |
| 11 | A | Yes. |
| 12 | Q | Can you tell us whether or not that person is in the |
| 13 | | courtroom? |
| 14 | A | He is at the defense table. |
| 15 | Q | Can you tell me what race he is? |
| 16 | A | Black. |
| 17 | Q | And how is he dressed, now today? |
| 18 | A | In a suit and tie. |
| 19 | Q | What did he do, the man who got out of the car? |
| 20 | A | He was very rude to me and demanded I move my chair out of |
| 21 | | the street. |
| 22 | Q | Did the two of you talk about what caused the accident? |
| 23 | A | Not at that time. |
| 24 | Q | And when he demanded you move your chair out of the |
| 25 | | street, what did you do? |

24

```
 1   A   I told him my joystick was down, and I could not move my
 2       chair.
 3   Q   And what did the person we have since learned is Mr. Funk
 4       do?
 5   A   I asked him to put my joystick back in where it's supposed
 6       to be.
 7   Q   Did he do that?
 8   A   Yes.
 9   Q   And after that happened, would your chair then operate?
10   A   Yes.
11   Q   What did you do?
12   A   I took northbound Jolly Road and went northbound on
13       Pennsylvania.  And eastbound on Jolly Road.
14   Q   Was that what you were intending to do?
15   A   Yes.
16   Q   So you went on your way?
17   A   Yes.
18   Q   And where did you go?
19   A   I went back to my home.
20   Q   About how long would it take you to go in your chair to
21       Trappers Cove from there?
22   A   About 15, 20 minutes.
23   Q   And when you got to your home, did you decide to do
24       anything further related to your chair having been struck?
25   A   I called 9-1-1 after I told my wife I thought I was hit.
```

25

| | | |
|---|---|---|
| 1 | Q | You say you thought you were hit.  Do you know sitting |
| 2 | | here today whether or not his car touched your chair? |
| 3 | A | Yes. |
| 4 | Q | And what happened?  Did it hit your chair? |
| 5 | A | Yes. |
| 6 | Q | So you called 9-1-1? |
| 7 | A | Yes. |
| 8 | Q | Did an officer respond? |
| 9 | A | Yes. |
| 10 | Q | Did he come in your apartment? |
| 11 | A | Yes. |
| 12 | Q | Did you explain to that officer what had happened? |
| 13 | A | Yes. |
| 14 | Q | And when you explained to that officer what had happened, |
| 15 | | what happened then? |
| 16 | A | I told the officer I got struck by his sergeant, by |
| 17 | | Lansing Police. |
| 18 | Q | When you saw the uniform of Charles Funk, did it have |
| 19 | | stripes on it? |
| 20 | A | Yes. |
| 21 | Q | Is that why you told him you got struck by his sergeant? |
| 22 | A | Yes. |
| 23 | Q | And what did that officer -- well, did that officer do |
| 24 | | anything further that day that you saw? |
| 25 | A | He told me he had to call his supervisor because he could |

```
1        not -- because he could not take my complaint.

2   Q    Did you have further contact with Charles Funk that

3        evening?

4   A    He showed up at my apartment.

5   Q    Do you know about how long it was after the other officer

6        told you he couldn't take your complaint?

7   A    About 15, 20 minutes.

8   Q    And what did you and Charles Funk do?

9   A    We talked and he said fine, you want to show me what

10       happened.

11              THE WITNESS:  No.

12  A    I said fine, let's go see the accident scene, because he

13       told me he had the right-of-way and I did not at the

14       crosswalk.

15  Q    So where did the two of you go then?

16  A    We went down to Jolly and Penn.

17  Q    How did you get there?

18  A    By a cop car.

19  Q    Do you know whether it was the same police car that struck

20       you?

21  A    I think so.

22  Q    And did you take your chair?

23  A    No.

24  Q    Did you ride with the officer in the police car?

25  A    Yeah.
```

27

```
 1   Q   When you got to Jolly and Pennsylvania, did you have
 2       further conversations about what had happened?
 3   A   Yes.
 4   Q   And what did Charles Funk tell you about his belief as to
 5       who had the right-of-way?
 6   A   He showed me that the crosswalk didn't have a crosswalk
 7       sign.
 8   Q   When you say it did not have a crosswalk sign, how many
 9       different indicators does that crosswalk sign have?
10   A   Um, three.
11   Q   What are they?
12   A   Walk.  Briefly stop.  Brake.
13               THE WITNESS:  No.
14   A   Blink.
15   Q   And what is the third?
16   A   And stop.
17   Q   And you're familiar with that crosswalk indicator?
18   A   Yes.
19   Q   And how sure are you that you were successful in causing
20       the walk sign to light?
21   A   Very, very sure.
22   Q   During your meeting with Charles Funk at the intersection
23       the second time, was there any discussion about a police
24       report?
25   A   I requested him to do a report.  He told me no, because he
```

28

1        didn't want to get me in trouble.

2  Q    And how did that make you feel?

3  A    Not happy.

4  Q    And how long were the two of you at the intersection the

5        second time?

6  A    About ten -- five, ten minutes.

7  Q    And what happened to you then?

8  A    He told me what I thought I did right.

9             THE WITNESS:  No.

10  A    No, let me back up.  He showed me I did not have the

11        crosswalk sign, and he had a green light.  And I thought

12        to myself, no, I know what I saw.

13  Q    And after that conversation about showing you the

14        crosswalk, where did you go?

15  A    Right back to my apartment.

16  Q    Do you know what city the intersection of Jolly and

17        Pennsylvania Avenue is?

18  A    City of Lansing.

19  Q    Do you know what county and state it is in?

20  A    Ingham County, state of Michigan.

21  Q    Was there any conversation about a report being taken

22        immediately after his car struck your chair?

23  A    No.

24  Q    So the first time there was no discussion?

25  A    No.

```
 1   Q    Only when you went back with him the second time?

 2   A    Yeah, I asked him to do a report and he said no.  He did

 3        not want me to be in trouble.

 4              MR. CHURCH:  At this time, Your Honor, I would

 5        like, I think by agreement, to introduce People's 2, which

 6        is the car camera video.

 7              THE COURT:  You had a stipulation as to People's

 8        2?

 9              MR. BOSTIC:  Yes, Your Honor.

10              THE COURT:  All right.  And you're playing

11        People's 2 at this time?

12              MR. CHURCH:  I am, Your Honor.

13              (From 2:11 p.m. to 2:14 p.m. People's Exhibit

14              Number 2 being played in courtroom)

15   BY MR. CHURCH:

16   Q    Can you see that screen, Mr. Palmer?

17   A    Yes.

18   Q    Can you tell me who is going across the crosswalk there?

19   A    Me.

20   Q    At this point what are you waiting to do?

21   A    To get a walk sign.

22              THE WITNESS:  (Unintelligible)

23   Q    Can you tell me where you are at this point?

24              THE COURT:  Mr. Church, we have to have it

25        translated first.
```

```
 1                      THE CHURCH:  Oh, I'm sorry, Your Honor.

 2                      THE COURT:  You can pause that for a moment.

 3   BY MR. CHURCH:

 4   Q    Can you tell -- well, it's a little late now.  Before the

 5        right turn, where exactly were you?

 6   A    I was getting off the sidewalk on Jolly and Penn.

 7                      THE WITNESS:  Yeah.

 8   Q    So when we saw you moving in your chair, what road were

 9        you crossing?

10   A    Crossing Pennsylvania.

11   Q    Can you tell what direction view this camera view is, what

12        road it is looking down now?

13   A    Eastbound Jolly Road.

14                      MR. CHURCH:  I believe that is all the questions

15        that I have of Mr. Palmer.

16                      THE COURT:  Cross-examination.

17                        CROSS-EXAMINATION

18   BY MR. BOSTIC:

19   Q    Good afternoon, Mr. Palmer.

20   A    Hello.

21   Q    My name is Nick Bostic and I represent Mr. Funk, and I'm

22        going to be asking you some questions.

23   A    Okay.

24   Q    If you don't understand, let me know.

25   A    I will.
```

STATE OF MICHIGAN

54-A JUDICIAL DISTRICT COURT (CITY OF LANSING)


THE PEOPLE OF THE STATE OF MICHIGAN,

v.                                          File No. 16-03901

CHARLES FUNK,

                    Defendant.

_____/

JURY TRIAL

Session II (of 2)

BEFORE THE HONORABLE LOUISE ALDERSON, DISTRICT JUDGE

Lansing, Michigan - Thursday, January 12, 2017

APPEARANCES:


For the People:            RUSSEL CHURCH (P70786)
                           Assistant Prosecuting Attorney
                           303 West Kalamazoo Street, Floor 4R
                           Lansing, Michigan 48933


For the Defendant:         J. NICHOLAS BOSTIC (P40653)
                           Attorney at Law
                           909 W. Washington Avenue
                           Lansing, Michigan  48906


Recorded By:               Tami Marsh, CER 5271
                           Certified Electronic Reporter
                           (517) 483-4421

Also Present:              Nancy Xiong, Court Clerk


1

```
 1                    THE COURT:  Other witnesses today, Mr. Bostic?
 2                    MR. BOSTIC:  The Defense calls Charles Funk.
 3                    THE COURT:  Watch your step.  Raise your right
 4        hand.  Do you swear or affirm the testimony that you're
 5        about to give shall be the truth, the whole truth, under
 6        penalty of perjury?
 7                    MR. FUNK:  I do.
 8                    THE COURT:  Please be seated.  Probably gonna
 9        need a little bit louder voice.
10                    THE WITNESS:  Okay, sorry.
11                    THE COURT:  And if you can speak your responses
12        and not just nod your head, that'll be helpful.
13                    THE WITNESS:  Okay.
14                    THE COURT:  Thank you.  Mr. Bostic, direct.
15                            CHARLES FUNK,
16        At 1:28 p.m., called by Mr. Bostic and sworn by the Court;
17        testified as follows:
18                          DIRECT EXAMINATION
19   BY MR. BOSTIC:
20   Q    State your name, please?
21   A    Charles Funk.
22   Q    Mr. Funk, in August of 2016, where were you employed?
23   A    City of Lansing Police Department.
24   Q    How long had you been a police officer?
25   A    Just shy of 19 years.
```

21

1   Q   Did you hold any rank?

2   A   Yes, sir, as a sergeant.

3   Q   And how long had you been a sergeant?

4   A   Four years.

5   Q   During your time as a police officer, did you have any

6       assignments that were -- that focused on traffic?

7   A   When I first -- I was road patrol when I first hired in

8       'til about -- oh, how long was that -- um, 2004.  Then I

9       was employed as a -- worked as an undercover narcotics

10      agent.  I did that for a few years.  I was a detective,

11      and now I've been a sergeant as of 2012.

12  Q   But Lansing Police Department has assignments that are

13      traffic oriented, correct?

14  A   Yes, sir.

15  Q   But in your career you didn't have that?

16  A   No.

17  Q   But as a road patrol officer, and maybe even as a road

18      sergeant, you occasionally investigated traffic accidents?

19  A   Correct.

20  Q   Now, on August 8th, 2016, were you on duty?

21  A   Yes, sir.

22  Q   Do you recall what time your shift started that day?

23  A   I worked the -- I worked the shift that started at three -

24      - I believe it was three p.m. to one a.m.

25  Q   And what kind of vehicle were you assigned to for that

22

|    |   |                                                            |
|----|---|------------------------------------------------------------|
| 1  |   | shift, if any?                                             |
| 2  | A | That day I drove our Chevrolet Tahoe.                     |
| 3  | Q | During that shift did you, at any time, have a partner in |
| 4  |   | your car?                                                  |
| 5  | A | No.                                                        |
| 6  | Q | Sometime after six p.m., were you near the intersection of |
| 7  |   | Pennsylvania and Jolly?                                    |
| 8  | A | Yes.                                                       |
| 9  | Q | Now, you saw on Tuesday the playing of, I think it's       |
| 10 |   | People's 1 or 2, but it was represented as a video from    |
| 11 |   | inside of your patrol car; you saw that?                   |
| 12 | A | Yes, sir.                                                  |
| 13 | Q | And you agree that's from -- that's where that generated   |
| 14 |   | from?                                                      |
| 15 | A | Yes.                                                       |
| 16 | Q | Now, that device, what caused it to capture what we were   |
| 17 |   | able to see?                                               |
| 18 | A | Um, what I've been told and I obviously see, it has a      |
| 19 |   | function where when you, when you make a traffic stop and  |
| 20 |   | you activate your lights, um, it automatically turns on    |
| 21 |   | your camera system.                                        |
| 22 | Q | Now, is there what's called a "look back," so it's always  |
| 23 |   | recording but it's real short?                            |
| 24 | A | Correct.                                                   |
| 25 | Q | And then when you turn on your equipment, that backwards   |

23

```
 1          period is also captured?

 2   A      Yes, sir.

 3   Q      In terms of the camera mounting on the vehicle, I realize

 4          it's gonna be different for different people, but where is

 5          it in relationship to where your view point would be as

 6          the driver?

 7   A      It's -- the camera is mounted, basically, at the heighth

 8          of your -- well, what would you call it, your head or

 9          whatever, mounted down from the top of the windshield over

10          in the passenger side.

11   Q      In terms of the span of the top of the windshield, is it

12          by the mirror or is it over by the visor, or do you know?

13   A      It would be just to the right towards the passenger side

14          of the rear-view mirror.

15   Q      Okay.  As you drove forward, once the light turned green,

16          did you have an awareness of the pedestrian control?

17   A      I believe so.  I was aware it was there.

18                 THE COURT:  We're talking about Pennsylvania and

19          Jolly, this specific time, or any location?

20                 MR. BOSTIC:  No, I'm talking about just this

21          incident, just this particular incident.

22   BY MR. BOSTIC:

23   Q      Can you say, with any certainty, as you started into that

24          intersection to make your turn, what that pedestrian

25          control for people going north across Jolly would have
```

24

|    |   |                                                              |
|----|---|--------------------------------------------------------------|
| 1  |   | displayed?                                                   |
| 2  | A | No, sir.                                                     |
| 3  | Q | When was your first awareness of Mr. Palmer?                 |
| 4  | A | I first noticed Mr. Palmer after I made my turn, and I was  |
| 5  |   | coming close to the right-hand side of the curb.  I just    |
| 6  |   | happened to glance into my right rear-view mirror, and      |
| 7  |   | that's when I saw the gentleman, later identified as Mr.    |
| 8  |   | Palmer, I saw a gentleman on his behind right by the        |
| 9  |   | sidewalk in the street.                                     |
| 10 | Q | Did you -- tell us about your conversation with him as you  |
| 11 |   | went up to him?                                             |
| 12 | A | I walked up to Mr. Palmer, and the first thing I said was,  |
| 13 |   | what happened, and I asked him if he was okay.  He said     |
| 14 |   | that he was.  Then I reached underneath his arms and        |
| 15 |   | placed him back into his wheelchair.                        |
| 16 | Q | What condition was his wheelchair in terms of upright or    |
| 17 |   | on its side or?                                             |
| 18 | A | It was upright.                                             |
| 19 | Q | Do you recall how it was facing; in other words, if you're  |
| 20 |   | sitting in it, were you then facing north, east, if you     |
| 21 |   | can tell us?                                                |
| 22 | A | I'm not positive.                                           |
| 23 | Q | After you got him back in the wheelchair, what was your     |
| 24 |   | conversation?                                               |
| 25 | A | We were working with the joystick controller, because it    |

25

1       appeared it was, like, on a piece of metal, metal that you

2       could bend, so he was kinda messing with it and I was

3       helping him, and then I was able to bend it back up to

4       where it was in a position where you could reach it.

5   Q   And then the video demonstrates you moving your car.  And,

6       then, the second time at the scene that you talked to him,

7       what was the conversation?

8   A   That's when I was asking him again, I was, like, are you

9       injured, are you hurt, um, I asked if he wanted an

10      ambulance.  I asked if he wanted me to take him to

11      Sparrow, um, I asked him if needed a report for his

12      wheelchair.  I asked him if he wanted CATA to respond,

13      because I know they have those CATA vans for people with

14      wheelchairs to transport.  I asked him where did he live.

15      I asked if he wanted me to transport him.  And all of his

16      responses were negative.  He didn't want anything.

17  Q   After you left his presence, was the incident brought back

18      to your attention somehow?

19  A   Yes.  Later on that evening I received a phone call from

20      Officer Belill.

21  Q   I don't want you to repeat the content of that

22      conversation, but after that conversation, what did you do

23      next?

24  A   I called my lieutenant -- my supervisor, Lieutenant

25      Anderson.

1   Q   And, again, I don't want the content, but as a result of

2        that call, what did you do next?

3   A   I responded to Mr. Palmer's residence.

4   Q   Now, during your second interaction with him, what

5        happened?

6   A   I asked him what he needed, and his -- you want his

7        response?

8   Q   Yes.

9   A   Was that he was basically talking about the right-of-way

10       and he wanted to, because he thought, like, his light was

11       green and my light was red.  He didn't know.  So I asked

12       him do you want to go back to the scene and, you know,

13       look at it, and he said yes.  And then that's when we went

14       back.

15   Q   Now, in terms of the sidewalks in that area, along the

16       south side of Jolly, east of Pennsylvania, do you agree

17       with Sergeant Darling, there's no sidewalk there?

18   A   Correct.

19   Q   At the time this incident happened, did you have an

20       awareness that the sidewalk didn't continue?

21   A   No.

22   Q   You heard Mr. Palmer's testimony where he described his

23       interaction with you as you being rude; you heard that?

24   A   Yes.

25   Q   Do you have any idea, can you enlighten the jury, as to

27

1   why he might think that way?

2 A   I don't know.  I know he was upset about the joystick

3   controller, because literally when I bent it back up and

4   he had it back in his hand, he was completely a different

5   person.  I mean, he just, just calm as can be right after

6   that.  So, but yeah, I don't know why he would say I was

7   rude.  That never happened.

8 Q   Fair to say the discussion ended up in a disagreement

9   between you and Mr. Palmer as to the right-of-way?

10 A   Not really, because at the time he didn't know that you

11   have to push this light.  So when we sat down and he

12   looked at it, and it went green for northbound traffic and

13   the walk stayed red, so at that point we're, like, okay,

14   that's what it is, and he was fine with it and then he

15   left northbound.  So we were fine at that point.

16        THE COURT:  Which conversation are you talking

17   about, sir?

18        THE WITNESS:  The second interaction at the --

19   after he had gone to the curb and I came up to talk to

20   him.

21        THE COURT:  The third one was when you brought

22   him back, then?

23        THE WITNESS:  Yes, ma'am.  But no, I'm not

24   talking about that time.

25        MR. CHURCH:  I'm totally unclear as to when the

28

1  || first one was, then, Your Honor.

2  ||          THE COURT:  Explain to the jury -- you're

3  || talking about a first and a second, and then I thought you

4  || were gonna be talking about the third, and then you

5  || bounced back to the second.

6  ||          THE WITNESS:  I'm sorry.  No, when Mr. Bostic

7  || said the first conversation, we're talking about, like,

8  || when I initially got out of my vehicle and went to talk to

9  || Mr. Palmer when he was in the street.  I got him back in

10 || his wheelchair.  The second one would have been when he

11 || moved himself over to the corner and I parked my vehicle,

12 || that would be the second.

13 || BY MR. BOSTIC:

14 || Q    And then after you went to his apartment and the two of

15 ||      you went back to the scene, did you have further

16 ||      discussions about the light controls?

17 || A    Yes.

18 ||          THE COURT:  I'm still just a little bit unclear

19 || on the last one.  You're stating that you did have a

20 || conversation with him at the scene, the original, what

21 || you're calling number two, about the light cycles?

22 ||          THE DEFENDANT:  Yes, ma'am.  We just watched the

23 || light cycle.

24 || BY MR. BOSTIC:

25 || Q    But you didn't, neither of you manipulated the buttons --

29

1   A   No, sir.

2   Q   -- is that correct?

3   A   Correct.

4   Q   And the third time you're at the intersection talking to

5       him, does he get out of your vehicle?

6   A   No.

7   Q   Did you get out of your vehicle?

8   A   No.

9   Q   So you have your discussion but you're in your vehicle?

10  A   Correct.

11  Q   Okay.  So once again, at that time nobody manipulated a

12      button?

13  A   Correct.

14  Q   Did he ever ask you to do a report?

15  A   No.

16  Q   Did you offer to do a report?

17  A   Yes.

18  Q   And when you offered what was his response?

19  A   No, he did not want one.

20  Q   You heard Sergeant Darling talk about, well, and Mr.

21      Palmer, that you said you believed you had the right-of-

22      way?

23  A   Correct.

24  Q   Why did you think you had the right-of-way?

25  A   When we looked at the light cycles, we just -- his was

30

1   red, mine was green.

2 Q As you entered the intersection while you were on

3   Pennsylvania and started your turn, were you looking where

4   you were going?

5 A Yes, sir.

6 Q Did you see anything in your path?

7 A No.   There was nothing in the intersection, nothing in the

8   roadway in front of me.

9     (At 1:43 p.m., Defense Exhibit G marked for

10     identification)

11 BY MR. BOSTIC:

12 Q I'm showing you what's been marked as Defense proposed

13   Exhibit G; do you recognize that?

14 A Yes.

15 Q As of August 8th, 2016, does that fairly and accurately

16   depict the size and location of the shrub?

17 A Yes, sir.

18     MR. BOSTIC:   I move G into evidence.

19     MR. CHURCH:   No objection.

20     THE COURT:   G is admitted.

21     (At 1:44 p.m., marked Defense Exhibit H for

22     identification)

23 BY MR. BOSTIC:

24 Q Sir, I'm showing you what's been marked as proposed

25   Defense Exhibit H; do you recognize the item depicted in

1          that photograph?

2   A     Yes.

3   Q     What do you recognize it to be?

4   A     Mr. Palmer's wheelchair.

5   Q     And did you see it while it was in his apartment?

6   A     Yes.

7   Q     And you, obviously, saw it out on Jolly Road?

8   A     Yes.

9   Q     Focusing primarily down, if you're sitting in it, what

10         would be the left front, the small wheel and the footpads,

11         are those fairly and accurately depicted in proposed

12         Exhibit H?

13   A     Yes, sir.

14             MR. BOSTIC:  I move Defense Exhibit H into

15         evidence.

16             THE COURT:  Any objection to Defense Exhibit H?

17             MR. CHURCH:  I don't believe so, Your Honor.

18             THE COURT:  H will be admitted.

19             MR. BOSTIC:  Your Honor, may I publish G and H.

20             THE COURT:  I just got a question.  When was H

21         taken and by whom?

22             MR. BOSTIC:  I can answer it, but --

23             THE COURT:  Do you know, Defense Exhibit H, when

24         that picture was taken?

25             THE WITNESS:  No, ma'am. I don't know.

| 1 | THE COURT: Do you know by whom? |
| 2 | THE WITNESS: No, ma'am. |
| 3 | THE COURT: Concern of the Court with regard to |
| 4 | its relevance if it's before or after the accident or |
| 5 | before or after this incident occurred, so that's a |
| 6 | concern. |
| 7 | MR. CHURCH: And I have not interposed any |
| 8 | objection, because I know the answer to the question as |
| 9 | well. It was taken by Trooper Darling about ten -- |
| 10 | THE COURT: And, again -- |
| 11 | MR. CHURCH: It was after. |
| 12 | THE COURT: You can publish to the jury. |
| 13 | MR. BOSTIC: Thank you. No further questions. |
| 14 | THE COURT: Cross-examination, Mr. Church. |
| 15 | CROSS-EXAMINATION |
| 16 | BY MR. CHURCH: |
| 17 | Q   You indicated earlier you were in Chevrolet Tahoe? |
| 18 | A   Yes, sir. |
| 19 | Q   Basically been around enough Tahoes that you know how high |
| 20 | a standard wheelbase is? |
| 21 | A   In numbers, no. I mean -- |
| 22 | Q   Not in terms of inches, but in terms of there are some |
| 23 | that are jacked up and some that come from the factory? |
| 24 | A   Yes, sir. |
| 25 | Q   This had basically a factory-standard wheelbase? |

| | | |
|---|---|---|
| 1 | A | I believe so. |
| 2 | Q | Sits high up off the ground? |
| 3 | A | Yes, sir. |
| 4 | Q | Would you agree with -- let me rephrase that.  Is that on |
| 5 | | a truck base? |
| 6 | A | I'm sorry. |
| 7 | Q | Is it on a truck chassis? |
| 8 | A | Yeah, I don't know for sure. |
| 9 | Q | But it sits high up off the ground? |
| 10 | A | Yes, sir. |
| 11 | Q | As far as the Lansing Police Department fleet of vehicles, |
| 12 | | it would be the tallest?  You got sedans -- |
| 13 | A | Suburbans, Tahoes. |
| 14 | Q | You've got Explorers; and it's taller than the Explorer, |
| 15 | | right? |
| 16 | A | Right. |
| 17 | Q | You got the CSI vans; it's taller than them? |
| 18 | A | I think the vans sit higher than the Tahoe. |
| 19 | Q | You have to kind of climb up to get into it? |
| 20 | A | The van? |
| 21 | Q | Yeah.  Well, the Tahoe? |
| 22 | A | Yes. |
| 23 | Q | You don't have to climb up to get into the van? |
| 24 | A | The CSI van? |
| 25 | Q | Yeah. |

34

1    A    Yeah.   Those vans are high.

2    Q    They don't have any kind of a step or nerf bar, anything

3         like that on them, do they?

4    A    I believe so.

5    Q    Be that as it may, you have to climb up into the Tahoe?

6    A    Yes, sir.

7    Q    And you are how tall?

8    A    I am six foot.

9    Q    Six foot even?

10   A    I believe so.

11   Q    Pardon?

12   A    I believe so, yes.

13   Q    You believe so?

14   A    Yes.

15   Q    And that's the position in which you were sitting in the

16        Tahoe?

17   A    Correct.

18   Q    You said that the mobile vision recorder, the L3 system

19        camera is mounted from basically the top of the dashboard

20        on the passenger side?

21   A    Of the mirror -- of the top of the windshield.

22   Q    Okay.   And it comes out how many inches from the top

23        windshield?

24   A    I wouldn't know, but it's basically, like, line of my --

25        your eyesight.

35

1   Q   Okay.  And you have the ability to manipulate it up and

2       down?

3   A   No.

4   Q   Do you have the ability to manipulate it from left to

5       right?

6   A   Yes.

7   Q   Did you on this occasion manipulate it from left to right?

8   A   No.

9   Q   You see on that -- well, let me back up a step.  Do you

10      know what the recapture time is for that when you activate

11      your lights?

12  A   I've been told but I don't know, like, myself I don't

13      know.

14  Q   Okay.  Did you do anything in terms of measurement in

15      terms of how far back it went from when you actually

16      turned the corner and turned your lights on?

17  A   Did I?  No, I didn't.

18  Q   I mean, I take it you watched that in preparation of being

19      here today?

20  A   Yes, sir.

21  Q   And you did not look to see the length of the recapture

22      time?

23  A   No.

24  Q   But you do see very clearly in that video, Mr. Palmer

25      crossing in front of you to go to the corner from where he

                                36

1      left when he was hit?

2   A     Yes, sir.

3   Q     And did you see it at the time?

4   A     No, I didn't.

5   Q     So, it's your testimony, in the several seconds that it

6      took Mr. Palmer to cross in front of your vehicle, you

7      never saw him?

8   A     Correct.  I have no recollection of him crossing in front

9      of me.

10   Q     Are you familiar with the traffic term failure to maintain

11      an adequate lookout?

12   A     Lookout?

13   Q     Yeah.

14            THE COURT:  Can you repeat that question; I

15      couldn't hear it.

16 BY MR. CHURCH:

17   Q     Are you familiar with the traffic terminology of failure

18      to maintain a proper lookout, failure to maintain an

19      adequate lookout?

20   A     No.

21   Q     Not paying attention to your surroundings?

22   A     No, sir.

23   Q     Isn't that a consideration that you look at in terms of a

24      traffic-accident investigation?

25   A     What do you mean, in terms of --

```
 1   Q   I'll withdraw it and ask it a different way.  Isn't it the
 2       duty of a motorist to pay attention to their surroundings
 3       when they're in a large vehicle moving down the road?
 4   A   When we do an accident, we'll ask them, did you see
 5       something, but I'm not familiar with that requirement, no.
 6   Q   Okay.  So you think it's okay for motorists to not pay
 7       attention?
 8   A   No, not at all.
 9   Q   Okay.  I just want to make sure we're on the same page.
10       Now, in conjunction with that car-camera system, there is
11       an audio component, right?
12   A   Yes.
13   Q   And typically by a shoulder mike, but there's also a
14       switch I believe in the cab of the vehicle that you can
15       turn it on?
16   A   The only thing I'm familiar with is the little, looks like
17       a little pager thing.
18   Q   That you clip onto your collar?
19   A   Yes, sir.
20   Q   Used to be one on your uniform before you had a body
21       camera?
22   A   Correct.
23   Q   And that was accessible to you in your car?
24   A   Yes, sir.
25   Q   The first time when you turned your lights on, it was
```

1      accessible to you?

2  A    Yes.

3  Q    And if you had turned it on before you left your car, it

4      would have recorded your entire conversation with Mr.

5      Palmer, would it not?

6  A    I believe so, yes.

7  Q    Okay.  And then you got told by Lieutenant Anderson to go

8      sort it all out; I'm paraphrasing, but basically your

9      responsibility to figure out what's going on here?

10  A    Yes, sir.

11  Q    So you went to Trappers Cove to where Mr. Palmer lives?

12  A    Yes.

13  Q    You went to his apartment?

14  A    Yes.

15  Q    And when you went to his apartment, did you have this

16      funky tape recorder that Sergeant Darling was talking

17      about yesterday?

18  A    No, I did not.

19  Q    But you had it in your car?

20  A    No.

21  Q    You did not have it in your car on August the 8th?

22  A    No, sir.

23  Q    So on August the 8th is when you went back, an hour or so

24      after your contact with him in the intersection?

25  A    Yes.

```
1   Q   Is when you had the conversation with Lieutenant Anderson
2       that sent you to Trappers Cove?
3   A   Correct.
4   Q   And, specifically, you were told if anything was different
5       than the way you originally reported it, Lieutenant
6       Anderson suggested that you make notes in CAD, right?
7               MR. BOSTIC:  Objection, Your Honor.  We had a
8       ruling on this conversation with Lieutenant Anderson.
9               THE COURT: I believe it was with regard to phone
10      calls between the two.
11              MR. CHURCH:  Let me back up a step and see if
12      Mr. Bostic still has the same objection.
13  BY MR. CHURCH:
14  Q   First of all, tell the jury what CAD is?
15  A   CAD is, I'm not gonna say -- I don't even know what it
16      stands for, but it's basically a system within our cars,
17      we have a laptop in our cars, and you have an ability --
18      like, a call will pop up on your screen.  So it will show
19      the call, the address, and then there's an area where you
20      can actually input comments about the call.  If it was
21      something that you wanted to keep in the notes, you can
22      simply type it in and then it would be kept with that call
23      in the system.
24  Q   It's fundamentally your way of memorializing contact.
25      Sometimes it needs police reports, sometimes it does not;
```

40

1       is that correct?

2   A   Correct.

3   Q   But it's where you keep notes?

4   A   Yes, you can.

5   Q   And in this day and age you are strongly encouraged not

6       to, for example, write them down onto a legal pad and take

7       them home with you, right?

8   A   I don't know about that.  People still -- yeah, we still

9       carry the pads and write in the pads.

10  Q   The only official record is what goes into CAD?

11  A   Correct.

12  Q   And do you have, on a daily -- or did you have, on a daily

13      basis, interactions with citizens that did not need a

14      police report that led to making CAD notes?

15  A   No.

16  Q   And it's your testimony that you likewise did not train

17      with officers that worked under you that if they had an

18      interaction with a citizen that was unusual, that they

19      should make notes in that system?

20  A   Right.  With the system, it's like you'll hear officers

21      say, can you put these notes into CAD, or you'll have

22      officers say, I don't know how to use it, dispatch, can

23      you put the notes in.  Because it's not with -- I know the

24      latest updated system, because I was in the jail three

25      years prior to this, it's different.  So a lot of officers

41

1   don't know how -- actually, even know how to use it.

2 Q  That doesn't answer my question, Mr. Funk.

3           MR. BOSTIC:  Your Honor, I'm gonna object to

4   relevance.  I'm not sure what any of this has to do with

5   the case.

6           MR. CHURCH:  I think it goes to his credibility,

7   Your Honor.  He had multiple opportunities to control the

8   information that's being given to the jury today and his

9   failure to do so I think goes to credibility.

10          THE COURT:  I'll give you some latitude with

11  regard to any notes or information he kept with regard to

12  this incident, whether in his system or --

13          MR. BOSTIC:  Well, Your Honor, I'm gonna ask the

14  Court to instruct the jury that Mr. Church's comment about

15  the defendant having the right or ability to control what

16  information --

17          THE COURT: You can redirect him on that

18  information.

19          MR. BOSTIC:  I'm objecting to Mr. Church's

20  comment that he had the right to control information the

21  jury sees or doesn't see.  That's highly prejudicial and

22  that's inappropriate.

23          THE COURT:  Any comments to the Court, so as to

24  that objection, Mr. Church?  Not with regard to what the

25  jury would see, but what you want to question this

42

1   defendant on about issues about his credibility.

2           MR. CHURCH:  My comments are not evidence, Your

3       Honor.

4   BY MR. CHURCH:

5   Q   You did not put any notes into the CAD system that night

6       or at any time related to your interaction with Mr.

7       Palmer?

8   A   Correct.

9   Q   You went to Trappers Cove about an hour or so after your

10      first interaction with him at Penn and Jolly?

11  A   Correct.

12  Q   And, ultimately, you and he got into your patrol car?

13  A   Yes.

14  Q   And you went back to the intersection?

15  A   Yes.

16  Q   And you parked in some location where you had the ability

17      to watch the light cycle?

18  A   Correct.

19  Q   But nobody got out of the car?

20  A   Yes, sir -- or no, sir.

21  Q   And how long were you at that intersection?

22  A   Not long.  Just long enough to see the cycle.

23  Q   Once?

24  A   Yes.  Well, not verbatim, but yeah, we watched it.  We saw

25      it cycle.

43

1  Q  You had conversation with him at that time?

2  A  Yes.

3  Q  And you were sitting in your patrol car?

4  A  Correct.

5  Q  And you could have activated the L3 system and the

6     microphone and recorded that contact?

7  A  Yes.

8  Q  And you did not?

9  A  Correct.

10 Q  I am confused, because I thought that's when the funky

11    tape recorder that you played a portion of contact with

12    Mr. Palmer when that was recorded; are you saying that is

13    not the case?

14 A  That's correct, that's not the case.

15 Q  So was there yet another interaction with Mr. Palmer?

16 A  No.

17 Q  So how did you get Mr. Palmer's voice onto a recorder that

18    you played for Sergeant Darling?

19 A  I recorded Mr. Palmer on an old cell phone I had that had

20    a recording feature, and when I heard that Mr. Darling

21    wanted to speak with me, I transposed it onto a cassette

22    tape and took it to the meeting.  That's the -- I couldn't

23    afford a digital thing, so I got the big, cheap, clunky

24    thing from the dollar store and that's what I played it

25    for him on.

1    Q    You got it from where?

2    A    Like, a dollar store.  Just a thrift store.

3    Q    I heard you on the tape tell Sergeant Darling you got in

4         all kinds of trouble because you taped over your wife's

5         nursing notes.

6    A    Yeah, when I transposed it onto, because I didn't have any

7         cassette tapes, the big cassette tapes, so I went through

8         my wife's drawer and I got one of her nursing things, and

9         that's what I used to record it from the phone on, the

10        tape to play for the Trooper at our meeting.

11   Q    You had it on a cell phone that's presumably a couple of

12        years old, because it has a recording function?

13   A    Correct.

14   Q    And you chose to go to a dollar store and buy a tape

15        recorder to take a digital cell phone recording, am I with

16        you so far?

17   A    Yes.

18   Q    And you transferred that digital recording that's on a

19        cell phone to a used cassette tape for the purposes of

20        playing it for Sergeant Darling?

21   A    Correct.

22   Q    Involving your conversation with a man who has severe

23        speech issues?

24   A    Yes.

25   Q    You had an opportunity to look at the Green Crush video?

45

| | | |
|---|---|---|
| 1 | A | Yes, sir. |
| 2 | Q | And on that video you can see Paul Palmer reach up and |
| 3 | | push that button? |
| 4 | A | Yes. |
| 5 | Q | And you -- how many years total road patrol, between |
| 6 | | supervision and officer? |
| 7 | A | I been there -- aside from the three years undercover and |
| 8 | | a year as detective, so the rest of the years would have |
| 9 | | been -- |
| 10 | Q | Something like 14? |
| 11 | A | Yeah, that's about right. |
| 12 | Q | So you're familiar with lots of intersections in the city |
| 13 | | of Lansing that have those buttons? |
| 14 | A | Yes, sir. |
| 15 | Q | Prior to August the 8th, did you believe those buttons just |
| 16 | | existed for the pedestrian's entertainment?  What did you |
| 17 | | think they did? |
| 18 | A | Change the lights. |
| 19 | Q | Pardon? |
| 20 | A | Change the lights. |
| 21 | Q | Change the lights for them? |
| 22 | A | Uh-huh. |
| 23 | Q | Right? |
| 24 | A | Yes. |
| 25 | Q | And that's exactly what Paul Palmer did? |

1  A   Yes.

2  Q   And you saw him do that on the video?

3  A   On the video, yes.

4  Q   So just looking back, I'm sorry, I'm one question away

5      from completing the conversation.  So the conversation

6      that was recorded on the no longer used cellular telephone

7      actually occurred when you had him in your car and drove

8      him back the second -- drove him from his apartment to the

9      intersection?

10 A   Correct.

11 Q   That's when you did that recording?

12 A   Correct.

13 Q   And when you did that recording, you had every ability to

14     do the same thing on a system provided to you by the

15     Lansing Police Department?

16 A   Yes, sir.

17 Q   You had some difficulty understanding Mr. Palmer, didn't

18     you?

19 A   Sometimes, yes.

20 Q   Did you recall -- and I'm not offering this, just for the

21     record, for the truth of the matter asserted, but for what

22     he did in response to it.  Do you recall telling Sergeant

23     Darling that what Officer Belill told you was that Mr.

24     Palmer was reporting that he had been, the word you used

25     was, "grazed" by your patrol car?

47

1   A   Yes, sir.

2   Q   So when you went back to talk to him, you knew that, at

3       least given information to believe, that he had told

4       another officer that there had, in fact, been contact with

5       him?

6   A   Correct.

7   Q   And despite that, you continued to believe your car had

8       not had any contact with him?

9   A   I believed it, but I mean, I went back and talked to him.

10  Q   And so you believed what?

11  A   That I had not had any contact with him.

12  Q   And continued to maintain that belief until Sergeant

13      Darling told you that he had watched the video from Green

14      Crush and could see that you did have contact with him?

15  A   Well, he said he could not -- he didn't see the impact

16      because it --

17  Q   The impact, but he told you you had hit him, right?

18  A   Right.

19  Q   And you laughed?

20  A   I'm sorry?

21  Q   You laughed?

22  A   I laughed?

23  Q   Do you remember laughing when he told you that?

24  A   No.

25  Q   You told him that you cut the curb, going over the curb,

48

1    do you remember that, that caused you to feel a bump on

2    the back of your vehicle?

3  A   Correct.

4  Q   When you looked at the Green Crush video, there's no

5    evidence that you cut the curb, is there?

6  A   But I still did it.  I mean, you can't see it, but I still

7    did it.

8         MR. CHURCH:  Those are all the questions I have,

9    Your Honor.

10         THE COURT:  Redirect, Mr. Bostic?

11                REDIRECT EXAMINATION

12  BY MR. BOSTIC:

13  Q   Mr. Funk, to the extent that your seated position in this

14    SUV is higher, are the bottoms of the windows equally

15    higher in the vehicle?

16  A   Yes.

17  Q   Did anybody ever show you any marks on your police vehicle

18    indicating contact had been made with Mr. Palmer?

19  A   No.

20  Q   Did anybody ever show you marks on your police vehicle

21    where the vehicle had come into contact with his

22    wheelchair?

23  A   No.  Mr. Darling said there was not damage.

24  Q   Well, I know, but I'm not asking you what he said, but I'm

25    asking you whether anyone has ever showed you --

```
1    A    No.

2    Q    Okay.  And on August 8th, you had an opportunity to stand

3         there and see the wheelchair, correct?

4    A    Yes, sir.

5    Q    And we have the exhibit there with the wheelchair in it.

6              THE COURT:   That's Defense Exhibit --

7              MR. BOSTIC:   That's H.

8              THE COURT:   Thank you.

9    BY MR. BOSTIC:

10   Q    Is that correct, Defense Exhibit H?

11   A    Yes, sir.

12             MR. CHURCH:   Your Honor, I'm not gonna oppose

13        the line of questioning, assuming I have the right to

14        recross, because I think it's a new subject area.

15             THE COURT:   It is a new subject area.  I'll

16        allow recross on it.  I allowed it for you on the other

17        side.

18             MR. BOSTIC:   You offered it, I know that.  I

19        don't know if I took it, but I know you offered it.

20   BY MR. BOSTIC:

21   Q    The left front -- the small, left-front wheel, do you see

22        that?

23   A    Yes, sir.

24   Q    On August 8th, 2016, did you have an opportunity to observe

25        that wheel?
```

```
 1   A     I saw it, yes.

 2   Q     Was it damaged?

 3   A     No.

 4   Q     The left footpad, was it damaged?

 5   A     No.

 6               MR. BOSTIC:  Nothing further.

 7               THE COURT:  As to those questions.

 8               MR. CHURCH:  Yes.

 9                     RECROSS EXAMINATION

10   BY MR. CHURCH:

11   Q     Mr. Funk, I'm going to show you what's been previously

12         introduced as People's 3.  Could you take a look at that?

13   A     Okay.

14   Q     Recognize that to be a fender on that wheelchair?

15   A     Yes, sir.

16   Q     And can you see the scuffmarks on that fender?

17   A     Yes, sir.

18               MR. CHURCH:  Okay.  Nothing further.

19               THE COURT:  Thank you, sir.  You can stand down.

20               (At 2:07 p.m., witness excused)

21               THE COURT:  Other witnesses today, Mr. Bostic?

22               MR. BOSTIC:  The Defense rests.

23               THE COURT:  Any rebuttal witnesses, Mr. Church?

24               MR. CHURCH:  Just very briefly I'm going to

25         recall Mr. Palmer.
```

1        THE COURT:  If you could please raise your right

2    hand.  Do you swear or affirm the testimony that you're

3    about to give shall be the truth, the whole truth, under

4    penalty of perjury?

5        MR. PALMER:  I will.

6        THE COURT:  Thank you.  And, again, for the

7    translator, do you solemnly swear that you will truthfully

8    translate for this Court to the best of your ability for

9    both the defendant and the Court?

10       MR. KAISER:  I do.

11       THE COURT:  And, again, your name for the

12   record?

13       THE INTERPRETER:  Ryan Kaiser.

14       THE COURT:  Thank you.  And if we can keep that

15   same as he reads a short portion of his answer, if you can

16   respond.

17       THE INTERPRETER:  Yes, ma'am.

18       THE COURT:  Thank you.  Direct exam, Mr. Church.

19                    PAUL PALMER,

20   At 2:07 p.m., recalled by Mr. Church, sworn by the court;

21   testified as follows:

22                REDIRECT EXAMINATION

23 BY MR. CHURCH:

24 Q   Mr. Palmer, where did the police car make contact with

25   your chair?

52

1    A    Right here.

2    Q    And, for the record, you're pointing to your left, larger

3         tire spindle?

4    A    Right.  Yeah.

5    Q    Did it make any contact with your footpad that caused

6         damage to it?

7    A    No.

8    Q    Are the marks that it left still visible?

9    A    Um, yes.

10            MR. CHURCH:  Your Honor, if I could just have

11        him just move in front of the jury so they can see his

12        chair better for just one second?

13            THE COURT:  Any objection to that, Mr. Bostic?

14            MR. BOSTIC:  No, Your Honor.

15            THE COURT:  All right.  Just make a pass for the

16        jury to see that, any allegations of damage.  Thank you,

17        Mr. Palmer.

18            Any other questions, Mr. Church?

19            MR. CHURCH:  Just a couple.

20   BY MR CHURCH:

21   Q    Was it the force of the impact that caused you to fall out

22        of your chair?

23            THE WITNESS:  Yes.

24            MR. BOSTIC:  Objection, Your Honor, this is not

25        rebuttal.  This was all addressed on direct.

53

```
 1                    THE COURT:  It was addressed in direct.

 2                    MR. CHURCH:  Based on Mr. Funk's belief that he

 3           didn't make contact (inaudible) --

 4                    COURT RECORDER:  I can't hear you.

 5                    MR. CHURCH:  I'm sorry.  Based on Officer Funk's

 6           comments he didn't think he made contact, I thought it was

 7           an appropriate line of questioning, Your Honor.  I'm done

 8           with it.

 9                    THE COURT:  Thank you.

10      BY MR. CHURCH:

11      Q    When you called the police, why did you call the police?

12      A    I thought I -- I thought I was hit and wanted to make

13           sure.  I wanted to --

14                    THE WITNESS:  No.

15                    THE INTERPRETER:  I was not sure I was hit.

16                    THE WITNESS:  Yeah.

17                    THE INTERPRETER:  I told my wife I thought I was

18           hit.  And she said call 9-1-1 and report it.

19      Q    What did you believe the police would do with that

20           information?

21      A    Give me a report for my insurance.

22      Q    Did you ever tell anyone that you did not want a report?

23      A    No.

24                    MR. CHURCH:  Those are all the questions that I

25           have, Your Honor.
```

```
1                        THE COURT:   Redirect (sic), Mr. Bostic?
2                              RECROSS-EXAMINATION
3    BY MR. BOSTIC:
4    Q    Mr. Palmer, had you ever made a claim to the City for
5         damage to your wheelchair?
6    A    Yes.
7    Q    When?
8    A    About a week after.
9    Q    Has it been paid?
10   A    No.
11   Q    Did you ever make a claim to your insurance to fix your
12        wheelchair?
13   A    No.
14                   MR. BOSTIC:   Noting further.
15                        FURTHER REDIRECT EXAMINATION
16   BY MR. CHURCH:
17   Q    Do you have any form of insurance that would cover the
18        damage to the chair?
19   A    Renters.
20   Q    And you've not asked them whether it was covered?
21   A    They told me -- the City of Lansing told me --
22                   THE WITNESS:   No.
23                   THE INTERPRETER:   City of Lansing told me it was
24        their car.  They would cover it.
25                   MR. CHURCH:   I don't have anything further, Your
```