UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHARLES FUNK,

    Plaintiff,

v.                                                                   Case No. 1:17-CV-514

CITY OF LANSING, a municipal               HON. GORDON J. QUIST
corporation, and MICHAEL YANKOWSKI,
in his individual and official capacity,

    Defendants.
_____/

## OPINION GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff, Charles Funk, brought this civil rights action, alleging race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*; the Michigan Elliot-Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws § 37.210, *et seq.*; and the First and Fourteenth Amendments to the United States Constitution. Defendants, City of Lansing and Chief Michael Yankowski, have filed a motion for summary judgment, asserting that Funk cannot sustain any of his claims against them. (ECF No. 28.) For the following reasons, the Court will grant Defendants' motion for summary judgment.

### I. Background

Funk is an African-American law enforcement officer. From 1997 through 2016, Funk worked first as a law enforcement officer and later as a sergeant in the Lansing Police Department (LPD).

According to Funk, in 2014 and 2015, relations between law enforcement and the African-American community deteriorated considerably on a nationwide basis. Funk states that based on

concerns he had about LPD's treatment of black suspects, Funk emailed Chief Yankowski on three occasions—December 12, 2014; January 15, 2015; and August 28, 2015. Funk met with Chief Yankowski shortly after each of these emails was sent, and in these conversations, Funk related incidents that he believed showed racial prejudice. But Funk did not refer any of his complaints to the BlueTeam complaint system (tracking software for which officers are instructed to enter positive or negative comments about incidents involving other officers); any other person in the chain of command; or Internal Affairs (IA).

Funk sought promotion to lieutenant for the first time in late 2015 to 2016. The promotional process involves a written test administered by an outside vendor known as EMPCO. There is also an oral presentation to a panel and a series of scenarios. Participants in the EMPCO testing receive a score from the testing. The top five scorers are placed into the "A Band" for promotion. The Chief of Police has the sole discretion to select any candidate from the A Band for lieutenant promotion taking into consideration factors other than just the test score. Chief Yankowski testified that those factors include IA history, seniority, command experience, community involvement, and commitment to the mission of the organization. He further testified that an applicant's entire career can be reviewed for supervisory promotional decisions to lieutenant.

In September 2015, Chief Yankowski promoted the highest scorer from the A Band, Sergeant Traci Ruiz, a Hispanic female, to lieutenant. On April 4, 2016, Chief Yankowski informed Funk that two other candidates from the A Band—Rodney Anderson, an African-American male, and Robert Backus, a white male—had been promoted to lieutenant positions instead of Funk. Funk asked Chief Yankowski why he had not been promoted, and Chief Yankowski responded that the chosen candidates had greater community involvement, as

2

compared to Funk, who lacked engagement or volunteering in the community, plus a lack of leadership, and disciplinary issues with IA. In June 2016, Chief Yankowski promoted Dave Sileo to lieutenant, leaving Funk as the only candidate not yet promoted from the A Band.

On April 6, 2016, two days after Funk learned that Anderson and Backus had been promoted over him, Funk filed a grievance with his union challenging the promotional decision. On April 12, 2016, Funk contacted the City's HR department to report a complaint of race discrimination and retaliation in the promotional process. The City responded by having Funk's complaint investigated by an outside attorney, Pamela Dausman. Attorney Dausman conducted her investigation in April and May 2016 and found that the City had not committed wrongdoing.

On August 8, 2016, Funk was on duty in a marked LPD vehicle. When he turned right at a corner, his vehicle hit a wheelchair occupied by Paul Palmer. According to Funk, he never saw Palmer until he saw him on the ground in the crosswalk using his side-view mirror and he did not actually make contact with the wheelchair. Funk helped Palmer back into his wheelchair and spoke with him. Funk did not activate his video or audio equipment during the conversation, did not complete any report of the accident, and did not ask Palmer for his name. Funk believed a report was not necessary because no one was injured and no property was damaged.

Later that evening, Funk received a phone call from Officer Belill, who was interviewing an individual who claimed to have been hit by a police vehicle. Funk assumed this was related to his contact with Palmer. Instead of ordering Belill to fill out a police report, Funk called his superior, Lieutenant Anderson. According to Funk, Palmer had changed his story from saying that Funk almost hit him when they talked on the scene to saying that he had been hit. Funk claims that Anderson told him to talk to Palmer again, and if Palmer's story had changed, Funk should write notes in the Computer Aided Dispatch (CAD) system.

3

Funk called Officer Belill and told Belill to clear the scene without doing a report because Funk stated that he would take care of it. Funk went to Palmer's residence and took Palmer back to the scene of the accident. Funk recorded his conversation with Palmer on a private cell phone instead of LPD communication systems. Palmer told Funk that he believed he, not Funk, had the right-of-way at the intersection. When Funk took Palmer back to the scene of the accident, Funk parked near the intersection and had Palmer watch the light cycles to show that the incident was not Funk's fault. Funk claimed that Palmer apologized to him, but he never made any notes of their conversation in the CAD system.

IA instructed Lieutenant Bayliss to conduct an investigation of the August 8, 2016, accident because Funk should have made a report of the accident. Funk was placed on administrative leave pending investigation. Bayliss interviewed Palmer, who indicated that: (1) he had been in an accident with a police vehicle; (2) the vehicle scraped his wheelchair; (3) he tried to file a police report; and (4) he had been persuaded by Funk to not file a police report on the grounds that the accident was Palmer's fault. In addition to interviews of Palmer and Funk, the evidence reviewed in the investigation included (a) photographs of damage to the wheelchair, an abrasion on Palmer's knee, and scuffing on the patrol car; (b) video from nearby stores of the accident; and (c) a determination of the traffic light sequencing at the intersection.

In addition to the IA investigation, the incident was referred to the Michigan State Police (MSP) to determine whether Funk had committed a crime. Funk provided MSP with an audio recording from his private cell phone of his conversation with Palmer. Bayliss also asked for the recording, but it was already in MSP's custody.

IA completed its investigation, finding that Funk had violated LPD policies regarding truthfulness; conformance to laws; accountability, responsibility, and discipline; and insubordination. A predetermination hearing was scheduled for September 15, 2016.

Chief Yankowski met with the union attorney, Steven Lett, at some point after the conclusion of the Lieutenant Bayliss's investigation. Chief Yankowski told Attorney Lett that Funk was facing some sustained charges that were pretty significant but that Chief Yankowski had not yet determined what the sanction would be. Funk spoke with Attorney Lett on the phone sometime after Attorney Lett met with Chief Yankowski. Attorney Lett told Funk that Funk could resign or face termination at the pre-determination meeting.

Funk decided to resign on September 12, 2016. If Funk had been terminated, he would have lost his pension, which was worth up to $4,000 per month. At the time that Funk chose to resign, neither Lieutenant Sosebee, who was in charge of recommending a sanction, nor Captain Southworth, who was in charge of reviewing Sosebee's recommendation, had completed his portion of the charge sheet. Their signatures on the charge sheet are dated September 13 and 14, 2016, respectively.

On September 13, 2016, Chief Yankowski received the results of the IA investigation with the recommended sanction. He testified that he never had a chance to review the investigation to determine if he agreed with the recommended dismissal sanction because Funk had already resigned.

The investigation by MSP resulted in the Ingham County Prosecutor issuing charges relating to the accident. Funk was later found guilty by jury verdict of the misdemeanor of unsafely approaching a wheelchair in a crosswalk.

## II. Standard of Review

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party moving for summary judgment can satisfy its burden by demonstrating "that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case." *Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005). Once the moving party demonstrates that "there is an absence of evidence to support the nonmoving party's case," the nonmoving party "must identify specific facts that can be established by admissible evidence, which demonstrate a genuine issue for trial." *Amini v. Oberlin College*, 440 F.3d 350, 357 (6th Cir. 2006).

While the Court must view the evidence in the light most favorable to the nonmoving party, the party opposing the summary judgment motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 357. The existence of a mere "scintilla of evidence" in support of the nonmoving party's position is insufficient. *Daniels v. Woodside*, 396 F.3d 730, 734–35 (6th Cir. 2005). The nonmoving party "may not rest upon . . . mere allegations," but must instead present "significant probative evidence" establishing that "there is a genuine issue for trial." *Pack v. Damon Corp.*, 434 F.3d 810, 813–14 (6th Cir. 2006).

Moreover, the nonmoving party cannot defeat a properly supported motion for summary judgment by "simply arguing that it relies solely or in part upon credibility determinations." *Fogerty v. MGM Group Holdings Corp., Inc.*, 379 F.3d 348, 353 (6th Cir. 2004). Rather, the nonmoving party "must be able to point to some facts which may or will entitle him to judgment, or refute the proof of the moving party in some material portion, and . . . may not merely recite the incantation, 'Credibility,' and have a trial on the hope that a jury may disbelieve factually

uncontested proof." *Id.* at 353–54. In sum, summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Daniels*, 396 F.3d at 735.

### III. Race Discrimination Claims

Funk claims that he was discriminated against based on his race when he was not promoted to a lieutenant position in April 2016 and when he resigned (constructive discharge) in September 2016. He brings his claims of race discrimination under ELCRA (Count I); Title VII (Count II); and 42 U.S.C. § 1983, based on an alleged violation of his rights under the Equal Protection Clause of the Fourteenth Amendment (Count IV).

To prevail on a claim of race discrimination, Funk must produce either direct or circumstantial evidence of disparate treatment and discriminatory intent. *Kuhn v. Washtenaw Cty.*, 709 F.3d 612, 624 (6th Cir. 2013). Some examples of direct evidence of discriminatory intent include "a facially discriminatory employment policy or a corporate decision maker's express statement of a desire to remove employees in the protected group." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). Funk admitted that he does not have any direct evidence of discriminatory intent or racial bias by Chief Yankowski. (Funk Dep. p. 179, ECF No. 28-2 at PageID.344.) Thus, all of Funk's discrimination claims are subject to the *McDonnell Douglas*[1] burden-shifting framework.[2] *Kuhn*, 709 F.3d at 624.

> A plaintiff claiming race-based discrimination supported only by circumstantial evidence must demonstrate that he (1) is a member of a protected class, (2) was qualified for the job at issue, (3) was subjected to an adverse employment action, and (4) was treated differently than a similarly situated nonprotected person.

---

[1] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973).
[2] Discrimination claims under ELCRA, Title VII, and § 1983 are all analyzed under the same framework. *See Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 652-53 (6th Cir. 2012); *Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. 2000).

> Once a plaintiff establishes a prima facie case, the burden of production of evidence shifts to the employer to articulate some legitimate, nondiscriminatory reason for its actions. The burden then shifts back to the plaintiff to demonstrate that the proffered reason was not the true reason for the employment decision, but was instead a pretext designed to mask unlawful discrimination.

*Id*. (internal quotation marks and citations omitted).

## A. *Failure-to-Promote Claims*

Turning to Funk's failure-to-promote claims, there is no dispute that Funk, an African-American male, is a member of a protected class. Nor is there a dispute that Funk was qualified for the promotion to a lieutenant position and was not promoted to that position. Defendants only dispute that Funk was treated differently than a similarly situated nonprotected person. Defendants point to the fact that of the three candidates promoted to lieutenant positions—Ruiz, Anderson, and Backus—at the time that Funk complained of race discrimination to HR, two of the candidates were members of protected racial classes. While that factor influences whether Funk can show pretext at a later stage of the analysis, it does not negate Funk's *prima facie* case because Funk has shown that he was treated differently (not promoted) than a similarly situated nonprotected person (Backus).

Thus, the burden shifts to Defendants to articulate a legitimate, nondiscriminatory reason for failing to promote Funk. According to Funk's own account, in April 2016, Chief Yankowski explained to Funk that he promoted Anderson and Backus because both had significant community involvement, had volunteered to take on additional responsibility at the Department, and contributed a lot of hours to their work. Chief Yankowski also noted that Anderson and Backus did not have pending IA complaints against them at the time of the promotional decision, whereas Funk had three.

8

The Court finds that Defendants carried their burden to articulate a legitimate, nondiscriminatory reason for failing to promote Funk, so the burden shifts to Funk to show that Chief Yankowski's rationale was merely a pretext for discrimination. "[A] reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S. Ct. 2742, 2752 (1993) (emphasis in original).

Funk argues the relative qualifications of Anderson and Backus, but Anderson is not a proper person to use as a comparator because he belongs to the same protected class as Funk. Thus, the Court will focus on Funk's assertions with regard to Backus.

Funk claims that Backus had more serious disciplinary problems, including two suspensions. However, over the course of his career with the LPD, Funk had 52 complaints against him made to IA (22 formal and 31 informal), with seven sustained investigations, whereas Backus had 23 complaints (12 formal and 11 informal), with only three sustained investigations.

Funk also claims that Backus's involvement in the Violent Crime Initiative was not a "community activity" but rather a departmental special assignment. While that may be true, Funk failed to recognize that Backus was also involved with community outreach (Shop with a Cop), was a union representative, volunteered his time with the Police Benevolent Association, attended community meetings, volunteered to write grants, and had received 34 awards for his work with LPD, compared to Funk's three awards.

Additionally, even if Funk could show that the reason given by Chief Yankowski was false, to carry his burden to show pretext, Funk would still have to show that the real reason for the failure to promote was race discrimination. However, Anderson, an African-American male and a member of the same protected class as Funk, was promoted at the same time as Backus.

9

Therefore, the Court finds that Funk has failed to carry his burden to show that the nondiscriminatory reason advanced by Defendants was pretextual and that Funk's race discrimination failure-to-promote claims fail as a matter of law.

*B. Termination Claims*

Funk next claims that he was constructively discharged when he resigned to avoid possible termination and that the constructive discharge was based on his race. Defendants dispute the merits of his race discrimination claim by first arguing that Funk cannot show that he was constructively discharged.

"To demonstrate a constructive discharge, Plaintiff must adduce evidence to show that 1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person, and 2) the employer did so with the intention of forcing the employee to quit." *Laster v. City of Kalamazoo*, 746 F.3d 714, 727–28 (6th Cir. 2014). Funk contends that he was constructively discharged because he resigned in lieu of being terminated to protect his pension.

Funk is correct in that a plaintiff can show constructive discharge if a defendant reasonably should have foreseen that his conduct would lead the plaintiff to preserve his pension by resigning rather than risking imminent termination. *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 554 (6th Cir. 2002). However, neither Defendants nor their agents were responsible for communicating to Funk that he was facing imminent termination. Attorney Lett told Funk that he would face termination at the predetermination hearing, but Attorney Lett was an attorney for the employees' union, not for the City, the LPD, or Chief Yankowski. No one from the LPD had yet recommended a sanction when Funk resigned. And Chief Yankowski told Attorney Lett that the review process was not complete, and the predetermination hearing would be used to discuss the recommended sanction and any mitigating and aggravating factors, as well as to give Funk and his attorney an opportunity

to speak. Thus, because Defendants did not communicate to Funk that dismissal was imminent, and because simply investigating an allegation of wrongdoing is not enough to create intolerable work conditions, *see Johnston v. O'Neill*, 130 F. App'x 1, 8-9 (6th Cir. 2005), Funk cannot show that his employer deliberately created intolerable working conditions sufficient to show constructive discharge. Therefore, Funk's race discrimination termination claims fail as a matter of law.

## IV. Retaliation Claims

Funk alleges that Defendants failed to promote him in retaliation for complaining to Chief Yankowski about the treatment of black suspects in 2014 and 2015 and constructively discharged him in retaliation for complaining to HR about not being promoted on the basis of race in April 2016. As noted above, Funk cannot establish claims of termination because he was cannot show that he was constructively discharged, so the Court will address only the retaliation claims with respect to Defendants' failure to promote Funk.

### A. Section 1983

Funk brings claims under 42 U.S.C. § 1983, alleging that he was retaliated against in violation of the First Amendment (Count V) and the Equal Protection Clause of the Fourteenth Amendment (Count VII).

Initially, the Court notes that there is no recognized Equal Protection retaliation claim. In his complaint, Funk states: "Plaintiff has a clearly-established constitutional right to be free from retaliation for opposing discrimination on the basis of race under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution." (Compl. ¶ 94, ECF No. 1 at PageID.13.) However, opposing discrimination on the basis of race would still be, if anything, protected activity under the First Amendment, not the Equal Protection Clause of the Fourteenth Amendment. Funk

has not cited any authority permitting or defining an Equal Protection retaliation claim, and this Court finds none.

Turning to Funk's retaliation claim under the First Amendment, "[a] retaliation claim essentially entails three elements: (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). Defendants argue that Funk cannot maintain a First Amendment retaliation claim because his complaints to Chief Yankowski on three occasions in 2014 and 2015 do not qualify as protected speech.

To determine whether a public employee's speech constituted protected conduct, courts engage in a three-step analysis. *Hughes v. Region VII Area Agency on Aging*, 542 F.3d 169, 180 (6th Cir. 2008). "First, a court must ascertain whether the relevant speech addressed a matter of public concern" and "whether the employee's expressions were made pursuant to his or her official responsibilities or whether the statements or complaints . . . [were] made outside the duties of employment." *Id.* (internal quotation marks and citations omitted).

Here, the Court agrees with Funk that comments concerning alleged discriminatory treatment of black suspects addressed a matter of public concern. However, the Court agrees with Defendants that Funk's complaints to Chief Yankowski were made pursuant to his official responsibilities.

According to Funk, the three complaints to Chief Yankowski involved instances in which black suspects were arrested for charges that were not supported by the facts outlined in the police reports. (*See* Pl.'s Resp., ECF No. 33 at PageID.678-79.) But, as the detention supervisor for

LPD, Funk was required to review reports before they were submitted to the prosecutor to ensure that they substantiated elements of appropriate charges and to address any deficiencies with the officers writing the reports so that the reports could be fixed accordingly. Thus, reporting inaccuracies or falsities in police reports was part of Funk's official responsibilities.

Moreover, even if Funk could establish the first two elements of a retaliation claim, he has not shown a causal connection between his complaints to Chief Yankowski and the lack of promotion. Nearly eight months passed between Funk's last complaint in August 2015 and being passed over for a promotion in April 2016.[3] "[W]here some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). Funk has failed to present any other evidence of retaliatory conduct. Thus, his First Amendment retaliation claim fails as a matter of law.

### B. ELCRA and Title VII

Funk also brings retaliation claims under ELCRA (Count III) and Title VII (Count IV). Those claims are analyzed under the same general framework as race discrimination claims. "A plaintiff may prove unlawful retaliation by presenting direct evidence of such retaliation or by establishing a *prima facie* case under the *McDonnell Douglas* framework." *Taylor v. Geithner*, 703 F.3d 328, 336 (6th Cir. 2013) (internal quotation marks omitted).

As Funk has not provided direct evidence of retaliation, the Court turns to the burden-shifting analysis. To establish a *prima facie* case, Funk must show that (1) he engaged in a protected activity under the various provisions; (2) the exercise of protected rights was known by

---

[3] Funk does not challenge Ruiz's promotion in September 2015.

13

Chief Yankowski; (3) Chief Yankowski took adverse employment action against Funk; and (4) there was a causal connection between the adverse employment action and the protected activity. *Id*.

While "[t]he burden of establishing a *prima facie* case in a retaliation action is not onerous," Funk has failed to establish the fourth element—a causal connection between the adverse action and the protected activity. *Id*. (internal quotation marks omitted). As noted above, given the time lapse of several months between Funk's complaints and being passed over for a promotion, Funk was required to show some other evidence of retaliatory conduct, which he has failed to do. *See Mickey*, 516 F.3d at 525. Moreover, even if the burden shifts back to Defendants, they have provided a legitimate, non-retaliatory reason for choosing other candidates for the lieutenant position. Thus, Funk's retaliation claims under ELCRA and Title VII also fail as a matter of law.

## V.  Conclusion

For the foregoing reasons, Defendants' motion for summary judgment (ECF No. 28) will be granted.

A separate order will follow.


Dated: May 24, 2019                                    /s/ Gordon J. Quist
                                                      GORDON J. QUIST
                                              UNITED STATES DISTRICT JUDGE